**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

November 16, 2020

**VIA ECF**
Honorable Alison J. Nathan
United States District Judge
United States Courthouse
40 Foley Square
New York, New York 10007

Re: **United States v. Michael Stern**, 20 Cr. 465 (AJN)

Dear Judge Nathan:

*"I have no doubt that for the remainder of my life that I will find meaningful ways to continue to be of service to others." – Michael Stern*

Michael Stern is the man his family has turned to in times of crisis since childhood. A loving father and committed friend, Mr. Stern has cultivated deep relationships with those he has encountered throughout the years. Hence, it was particularly difficult for him to face the reality of the damage he had caused his family, particularly his son, Alex, during the course of the instant offense. Full of remorse, Mr. Stern now stands before Your Honor and requests a sentence of time served and one year of supervised release. Given Mr. Stern's lack of criminal record, his commitment to leading a law abiding life, and the worsening COVID-19 pandemic, a sentence of time served is appropriate in this case.

## Background

Michael Stern was born on November 27, 1956 in Chicago, Illinois. The eldest son of two children in a working class immigrant family, Mr. Stern developed a strong work ethic at an early age. Indeed, since he was 11 years old, Mr. Stern became financially independent when he began cutting lawns for neighbors in the community. Around that time, Mr. Stern's family moved to Detroit, Michigan for a work opportunity for his father with Singer Sewing Machines. There, Mr. Stern joined a junior achievement program where he learned about business and construction, which led him to start working as a draftsman at an architecture firm in junior high school.

While the family moved to Michigan for a job opportunity in the hopes of financial stability, it never came to fruition, leading to his parent's divorce after twenty years of marriage. Upon their divorce, Mr. Stern resided with his mother, who only worked sporadically throughout

her marriage and could only now find part-time work at a women's store. Moreover, his father could no longer provide any financial support to the family. Thus, at 13, Mr. Stern took on the heavy burden of providing half of the family's income by working as a draftsman and continuing his lawn mowing business while completing his junior high school studies.

Although two years later Mr. Stern's parents remarried each other, Mr. Stern still faced challenges growing up Jewish in his Michigan community. Judaism was an important part of Mr. Stern's upbringing; his maternal grandmother was the lone survivor of the Holocaust while her 10 siblings and both parents were killed. This history and his mother's Hasidic background made Judaism an integral part of Mr. Stern's life. Thus, it was particularly challenging for him in high school in Berkeley, Michigan where there were no other Jewish students, leading him to face constant bullying. Indeed, Mr. Stern would be called a "dirty Jew" and remained isolated from his peers, causing his grades to suffer.

When his family moved to Miami, Florida for a new job opportunity for his father, Mr. Stern's high school experience drastically improved. Without facing the stigma as the only Jewish student in school, Mr. Stern successfully completed his senior year of high school with straight As. In an effort to save money for college, Mr. Stern took a year off and worked as a junior architect for an architecture firm during weekdays, worked nights at a movie theatre, and worked weekends as a hotel valet. Mr. Stern's efforts to save money proved worthwhile as he obtained his Associate's Degree from Miami Dade Community College where he took night classes while working part-time. Thereafter, he attended Pratt Institute and graduated with his Bachelor's Degree in Architecture while working full-time at an architecture firm. *See* Ex. A at 6.

It was while working at an architecture firm during his college years that he met his ex-wife Diane Martin. *See* Ex. A at 6. The couple married in 1980 and had three children during the course of their 21-year-long marriage – Julie, Robin, and Alex. Mr. Stern is described by loved ones as a "devoted father," who is incredibly active in his children's lives. Ex. A at 6. Mr. Stern's daughter, Robin, describes the "fond memories" she has of her dad biking her and her siblings around town and his serious involvement in her schooling. Ex. A at 1. Similarly, his daughter, Julie, describes Mr. Stern as "the best dad I could have ever asked for growing up," who provided "constant support" for her throughout childhood and now as a working mother. Ex. A at 3. Close friends also similarly described Mr. Stern as a "wonderful father, supportive and involved." Ex. A at 5. Long-time friend, Charlie Stein, discussed how he and Mr. Stern "would team up for many volunteer projects at [their] [] kids' school and lead the 4th of July parades down [their] [] block." Ex. A at 7.

 

2

However, it is with his son, Alex, that Mr. Stern has felt the greatest loss. As his ex-wife, Diane, explains, "Michael and Alex have always been extremely close." Ex. A at 6. Indeed, the father and son worked together for a period of time. Thus, when Mr. Stern failed to file is income tax returns in 2007 and, unbeknownst to Alex, utilized his son's company as a way to avoid payment of those owed taxes, it drove a wedge between them. As long-time friend, Julia Robbins, observes, "the thing [Mr. Stern] regrets the most about the tax-related case before you is the damage it did to his son Alex and to their relationship." Ex. A at 5.

Mr. Stern deeply regrets that despite notifications from the IRS regarding owed taxes, he continued to fail to pay the owed taxes and failed to report the income received through the rental properties he subleased through his son's name and company. Moreover, he regrets all actions he took to avoid payment of those owed taxes. But, Mr. Stern offers no excuses and is committed to making full restitution. In 2017, when he was first made aware of the investigation in this case, Mr. Stern cooperated with the investigation and made no attempts to flee. Mr. Stern waived his right to prosecution by indictment, pled guilty to one count of tax evasion via information, and surrendered himself to the U.S. Marshalls Service for processing in the midst of the pandemic.

**A Sentence of Time Served and One Year Supervised Release is Appropriate Punishment**

Mr. Stern is scheduled to be sentenced on November 30, 2020 pursuant to having pleaded guilty to one count in violation of 26 U.S.C. § 7201. All parties are in agreement that the Sentencing Guidelines range is 12 to 18 months' imprisonment, which is in Zone C, with a maximum fine of the greatest of $250,000, twice the pecuniary gain derived from the office, or twice the gross pecuniary loss to persons other than the defendant. *See* Plea Agreement, dated Aug. 6, 2020 at 1,3; PSR ¶ 5. Zone C may be satisfied by a sentence of imprisonment that includes a term of supervised release with a condition that substitutions home detention for half the term of imprisonment. *See* U.S.S.G. §5C1.1(d).

As the Court is well-aware, the sentencing guidelines are only advisory. In *Gall v. United States*, 128 S.Ct. 586, 596 (2007), the Supreme Court explained that "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however." A trial judge "may not presume that the Guidelines range is reasonable" but "must make an individualized assessment on the facts presented" after considering all of the factors set forth in §3553(a). *Gall*, 128 S.Ct. at 596-7.

At the sentencing hearing, the district judge in *Gall* "reminded Gall that probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom." *Gall*, 128 S.Ct. at 593. The Supreme Court agreed: "Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty." *Id.* at 595.

Section 3553(a) directs the Court to impose a sentence "sufficient but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. Among the factors the Court must consider is the need to "avoid unwarranted sentencing disparity." A review of

recent cases involving similar conduct confirms that the modest variance of time served in this case will not create any "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Such a sentence is sufficient, without being greater than necessary, to incapacitate, deter, and punish Mr. Stern, but still sends a strong message to the public generally that evasion of tax laws is not tolerated.

As an initial matter, a prison sentence is unnecessary to deter Mr. Stern from future criminal activity. Other than the instant offense, Mr. Stern has had no prior contacts with the criminal legal system. The Court can have confidence that Mr. Stern's actions in this case were aberrational in nature and that he will not resume the criminality, no matter how minor.

In addition to his lack of criminal history, as Mr. Stern and his loved ones noted in their letters, the impact of this case has reverberated deeply for Mr. Stern, ensuring he will never engage in similar conduct in the future. As the subject of a three-year long investigation, Mr. Stern has experienced significant anxiety and profound remorse for his actions that has impacted one of his most precious relationships – that with his son. As his longtime friend, Stephanie Smith, notes in her letter, Mr. Stern has been "tense and nervous" throughout this process, describing it as a "nightmare." Ex. A at 9. Mr. Stern's ex-wife, Diane Martin, describes the "devastating" impact Mr. Stern's conduct has had on their children's lives, but finds hope in his acceptance of responsibility and his sincere interest in "mak[ing] this right." *Id.* at 6. Most significantly, Mr. Stern himself describes his "deep remorse and regret for [his] actions." Ex. B.

Moreover, Mr. Stern's conduct during the course of the investigation and during the pendency of this case demonstrate his interest in leading a law abiding life. Despite living across the country, Mr. Stern made no attempts to flee or engage in any other forms of criminal conduct to evade this prosecution. Rather, he has remained cooperative throughout the process, so much so that the government consented to his release in the instant offense without any pretrial supervision or travel restrictions within the continental United States.

Notably, in other cases involving tax evasion, courts have frequently sentenced defendants to time served even in cases where the Guidelines were significantly higher than in Mr. Stern's case. *See, e.g.*, *United States v. Lindenbaum*, 17 Cr. 106 (PAC) (S.D.N.Y. Jan 11, 2018) (sentencing defendant to time served where defendant evaded a six million dollar tax bill and faced a guidelines range of 30 to 37 months); *United States v. Gajwani*, 16 Cr. 660 (LAP) (S.D.N.Y. Apr. 4, 2018) (sentencing defendant to five years' probation with six months of home confinement despite a guidelines range of 51 to 63 months); *United States v. Chang*, 14 Cr. 586 (ALC) (S.D.N.Y. Aug. 11, 2017) (sentencing defendant to time served where defendant was charged with four counts and had a guidelines range of 12 to 18 months).

Additionally, in evaluating the §3553(a) factors in this case, the pandemic and its potential effect on Mr. Stern must be considered in the determination of whether a variance is warranted. We believe it is. Following any sentence imposed by the Court, other than time served, will expose him to the harsh conditions of detention that has plagued the BOP since March. While Mr. Stern does not present any known health issues – in part due to his inability to seek medical care because of a lack of health insurance – Mr. Stern is a 64-year-old man. This is

significant as older adults and men have been particularly at risk for serious complications due to COVID-19.[1]

In *United States v. Torres*, 87 Cr. 593 (SHS), 2020 WL 2815003 (S.D.N.Y. June 1, 2020), Judge Stein adopted the argument echoed by many other scientists as well as Attorney General Barr (in his Memorandum to the Bureau of Prisons dated April 3, 2020), that realistically, the best way to mitigate the damage caused by COVID-19 and reduce the death toll is to decrease the jail population. *Citing United States v. Nkanga*, 18 Cr. 713 (JMF), 2020 WL 1529535 at *1 (S.D.N.Y. March 31, 2020). In *Nkanga*, Judge Furman also recognized that "the country faces unprecedented challenges from the novel coronavirus pandemic. Those detained in jails and prisons face particularly grave danger." Other judges in this District including this Court, have recognized that the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals. *See United States v. Scparta*, 18 Cr. 578 (AJN), 2020 WL 191048 at *1 (S.D.N.Y. April 20, 2020); *Nkanga*, 2020 WL 1529535 at *1; *United States v. McKenzie*, 18 Cr. 834 (PAE), 2020 WL 1503669 at *3 (S.D.N.Y. March 30, 2020); *Torres*, 2020 WL 2815003.

Judges within this district have also considered the impact of COVID-19 in the prison and its effects as a 3553(a) factor. Several have reduced sentences based on the pandemic and harsh conditions of detention. *See, e.g.*, *United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (cutting the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (same for defendant detained at MDC).

In *United States v. Paulino*, 19 Cr. 607 (AJN) (S.D.N.Y. Oct. 27, 2020), this Court sentenced defendant to time served despite facing a guidelines sentence of 27 to 33 months after pleading guilty to conspiracy to commit bank fraud. Similar to Mr. Stern, the *Paulino* defendant did not serve a term of pre-sentence detention and presented no health issues. Nonetheless, despite only being 39 years of age, this Court determined that a time served sentence was an appropriate and just sentence, citing, *inter alia*, the conditions of detention during the COVID-19 pandemic.

Mr. Stern's case warrants those same considerations. Mr. Stern has demonstrated his commitment to living a law abiding life. As a grandfather, he has been an integral part of his family, particularly since the pandemic lockdown began. As his daughter, Julie, notes in her letter, Mr. Stern cares for her four children – three of whom attend school remotely – while she works from home: "I truly could not pull this off without him and I will be forever grateful." Ex.

---

[1] *See* Center for Disease Control, *Your Health, Older Adults* (updated Sept. 11, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (noting that risk for serious illness increases with age); Richard R. Reeves & Tiffany N. Ford, *COVID-19 much more fatal for men, especially taking age into account*, Brookings (May 15, 2020) available at https://www.brookings.edu/blog/up-front/2020/05/15/covid-19-much-more-fatal-for-men-especially-taking-age-into-account/ (finding that men present an increased risk to COVID-19 complications than women).

A at 3.  Mr. Stern hopes to continue to be of service to his family during their time of need – a need he will not be able to meet for his family if sentenced to a term of incarceration.  With Mr. Stern's lack of criminal record, his demonstrated commitment to leading a law abiding life, and the ongoing pandemic that could prove potentially fatal for someone of Mr. Stern's sex and age, a sentence of time served is just and warranted.

## Conclusion

Mr. Stern made a serious mistake for which he is remorseful. A non-custodial sentence with restitution is "sufficient but not greater than necessary" to satisfy all of the statutory purposes of sentencing.  Even with a steady job, making monthly restitution payments will involve additional sacrifices for Mr. Stern and his family. It will be a monthly reminder of his transgression.

Accordingly, for all of the foregoing reasons and in an appeal to this Court's reason, we respectfully ask the Court to impose a sentence of time served with one year of supervised release.

            Respectfully submitted,

            *Marisa K. Cabrera*

            Marisa K. Cabrera, Esq.
            Assistant Federal Defender

Cc:  AUSA Timothy Capozzi